May it please the Court, we are here today on behalf of Sue Ellen Bolte in connection with a matter that comes before this Court as a result of a ruling by the Supreme Court in the United States, a ruling handled back on October 12th of last year by James Conway in the 14th Judicial Circuit in Rock Island County, Illinois. The case is a fairly straightforward one involving a review of maintenance concerning the marriage of the two parties. Mr. and Mrs. Bolte, we'll refer hereafter to Terry and Mrs. Bolte as Sue as they are referred to in our pleadings and in the briefs before the Court, were married for a total of 27 years. During that period of time they had and raised three children, all of whom were grown, flown, and on their own by the time that Mr. Bolte sought a divorce from Mrs. Bolte, which was granted in April of 1998. One of the key provisions of the divorce decree was a provision that allowed Mrs. Bolte, for reasons I will get into in a moment, rehabilitative maintenance, reviewable, upon Terry's retirement from employment. Terry at the time that the parties were divorced was 46 years of age, so we could reasonably assume that if he worked for a reasonable period of time and terminated employment or retired when most folks do, that he would retire at age 65. Instead, Mr. Bolte, for a variety of reasons, chose to terminate employment, to retire at age 59, which triggered the current proceeding, which started originally with him filing a petition to modify back in August of 2009. We filed a response on behalf of Sue to that proceeding. We did some written discovery on that, and then in December his attorney at that time filed a motion for voluntary dismissal based on the fact that he wasn't going to retire for another 12 months. Five months later, however, Mr. Bolte's current attorney, Mr. Anditch, filed the current proceeding, a 16-page pleading petitioning for review and termination. Two months later, an additional 16-page amended pleading was filed by Mr. Bolte, this time asking for review, termination, or extension but reduction. Of course, Mrs. Bolte was obligated to respond to all of these pleadings, including the initial pleading that was dismissed, which initiated also some discovery, and the subsequent pleadings that were filed with the court. Significant discovery was taken in this case, which went on for a period of time, leading up to the final hearing on this matter, which was in September of 2011, September of last year. In that hearing on September 2nd of 2011, the following evidence was presented. Now, I should mention that because the original judgment of dissolution had provided that this would be rehabilitative maintenance reviewable upon Terry's retirement, the burden of proof, of course, in that proceeding would have normally rested upon the payee, since the rules of maintenance are such that if it's permanent maintenance, the person who's making the payments has a responsibility for showing that the maintenance should be maintained. If it's rehabilitative or reviewable maintenance, it's pretty clear that the payee, the person who's receiving that maintenance, has the burden of going forward with the evidence and showing why the maintenance should be continued. Now, I do want to emphasize that I think one of the key points in this proceeding is that the parties had agreed that the maintenance would not even be reviewable for the period of time from age 46 until Terry retired, normally at age 65, which would have been a 19-year period. By Terry's retiring six years early, he triggered that review process sooner. He did a couple of other things. He potentially shortened the obligation that the parties had originally contemplated, and he reduced the amount of pension benefit which Sue was allowed to receive under a quadro that was part of their divorce decree, reduced it by about 40 percent. She would have had almost $300 a month in pension benefits, and it was knocked down to $180. Now, the court may wonder why was the maintenance provided for such an extended period of time. It was provided for that period of time for the reasons that were articulated by Sue and her doctor at the hearing in September of last year. Sue is acutely afflicted with a disease called myasthenia gravis, a disease that affects the nervous system, the respiratory system, and the cardiac system. Her doctor at the time of the hearing, a Dr. Charles Brunchins, testified that there are a number of side effects that this myasthenia gravis has on a patient and is having on Sue at the present time. He said that in the last 10 years, she's had 50 hospitalizations. He indicated that she requires at least monthly plasmapheresis treatments, which are expensive procedures, not unlike kidney dialysis. He testified that she has required and will be likely to require additional hospitalizations, and he testified, perhaps most critically to this proceeding, that she is unemployable. Sue had attempted, following the judgment of dissolution on multiple occasions, to try to resume work. On four different occasions, she sought to obtain employment. On each of those occasions, she was rewarded for her efforts by being hospitalized. And the ironic thing about that is that as a result of her attempting to work, she wound up depleting what limited assets she had come out of the marriage with. So she was basically left, at the time of the hearing in September, with two assets, a house worth about $100,000 in mortgage to almost that same amount, and a car with 99,000 miles on it. And the prognosis for the future is not good. The judge at the trial court level, Judge Conway, concluded that the testimony from Dr. Brunchins had shown that Sue was to a reasonable degree of medical certainty, fully and totally disabled from employment, suggesting that any future employment for Sue is virtually out of the question, unless a miracle cure, of course, is found for myasthenia gravis. Terry, on the other hand, is in pretty good shape. One of the reasons the court probably provided for the review, I wasn't involved at the time the original judgment of dissolution was granted, nor was Mr. Andage, but one of the reasons in all likelihood was because circumstances can change when a person retires, oftentimes with a person's income going down. In this case, it's quite the reverse. Terry's income now is 34% higher than it was when the parties were divorced. At the time the parties were divorced, his income was about $5,800 a month. Now it's over $1,000. In addition, Terry has about a $278,000 401k, that according to exhibits that we obtained in discovery and we submitted in the record, that the 401k is generating interest at 9.5%, which would be roughly an additional $27,000 in annual income he'd have coming in. He and his wife, the woman he married shortly after he divorced Sue, live in a house in southeastern Michigan on 28 acres of land, and both of them have $13,000 in annual income. The judge at the trial court level, Judge Conway, concluded that the judgment of dissolution was to a reasonable degree of medical certainty, unless a miracle cure, of course, is found for myasthenia gravis. 24 of which is tillable and is leased to farmers in the area. And they own 88 acres of recreational land in the Michigan Upper Peninsula, about 15 miles from Lake Michigan. In addition, he had, according to records that were obtained and produced in evidence, at least $25,000 in a credit union account and quite a collection of motor vehicles, including an SUV, a pickup truck, two Harley Davidsons, which he estimated had a value of $49,000. Total value of his estate, excluding his income, comes to almost three quarters of a million dollars, by his estimation, not by ours. And of course, we didn't have the opportunity to do independent appraisals of his property, but just using his values, we come up with three quarters of a million dollars. In addition, his current wife continues to work and earns $74,000 a year. Now, I recognize that normally the income of a spouse, a current spouse, isn't required to support an ex-spouse, but a number of cases have held that where the ex-spouse's income is used and combined to support the, in this case, the payors' income, that is appropriate to consider. And Mr. Bolte, Terry, testified at trial that he and his wife combine their incomes and pay their expenses together. She has about $6,200 a month in gross income, combined income of about $14,000 a month between the two of them, as compared with Sue, who now has $1,200 a month. After all this evidence was produced at trial, Judge Conway took the matter under advisement and in early October handed down a decision which is, to say the least, hard to explain. In his decision, he did not give any consideration whatsoever to any of the review standards under Section 510A-5, which is the relevant provision of the Marriage and Dissolution of Marriage Act that requires certain things be considered on review hearings. He rather lightly glossed over the provision of the party's Judgment of Dissolution and Marriage Settlement Agreement that called for a review upon Terry's termination and simply said that this was a, he used the term, a rubric for trying to extend the maintenance beyond what the parties had reasonably contemplated, and he terminated maintenance outright, leaving Sue about $2,200 short each month in the income as against what her expenses are. The 9B affidavit filed with the court indicated her total expenses each month, much of which, of course, is for medical, $3,400. The amount that she now has in income is $1,200. So she's about $2,200 a month short in terms of her income versus expenses. While her husband, ex-husband I should say, has managed to accumulate the substantial estate we've talked about while paying for her maintenance, and now has a higher income, about 34% higher than what was being earned at the time that the parties were divorced. Given these circumstances, as I say, the judge essentially chose to disregard Section 510A-5 and rule that because she had received maintenance for a period of 12 and a half to 13 years, it wasn't possible, it wasn't possible that it could extend beyond that, even though the parties had agreed to review, because to do anything more than that would be to grant permanent maintenance, and the parties would waive permanent maintenance. Now, the judge's decision, I think, overlooks several key principles. Two in particular. One are rules of contract law. Obviously, one of the plain basic rules of contract law, I think we all learned our first year in law school is that you give the plain meaning to the terms of the parties. In this case, the parties clearly agreed that reviewability would be provided for their maintenance when Terry retired. Now, the fact that Terry retired six years early could be treated as a measure of bad faith on his part in order to accelerate the review, but let's put that aside for the moment. The fact is the decree called for reviewability. The trial court ignored that and instead chose to treat the word reviewable as meaning terminable, which obviously any definition in the dictionary would not cover. Well, reviewable. I mean, if it's reviewable, it could be terminable. Sure. But your argument is that it doesn't necessarily mean it terminates. Yes, thank you. And our concern, Your Honor, is in this case he didn't so much as give a wink or a nod in the direction of Section 510A-5. In fact, if one reads his 15-page opinion, you'll be hard-pressed to find even a reference to the statute, much less any of the requirements or conditions under that. Of course, the second rule of contract law is you won't interpret a contract so as to render a term a nullity. Well, the judge clearly did just that by ignoring the term reviewable and superimposing a different term on that. And the third rule of contract law that he ignored in handing this decision down is that a specific provision of a contract shall control a general provision. The judge's reliance in his decision weighed heavily on the fact that in the boilerplate at the end of the divorce decree and the marriage settlement agreement, the party said they'll waive all other kinds of maintenance. Didn't mention permanent maintenance at all, although Mr. Bolte and his attorney have made much of the fact we're asking for permanent maintenance. We have not mentioned permanent maintenance except in response to their motions. The MSA, the marriage settlement agreement, didn't make reference to that. What kind of maintenance are you asking for? Well, we're asking for an extension of the rehabilitative maintenance on an ongoing basis based on the fact that she has a continued disability. And after a 27-year marriage, that should be enough to warrant an extension. This court, in the case of In re Stam, back in the early 90s, took a situation of rehabilitative maintenance where it was extended for a period of seven years and then reviewable at the end of seven years for a five-year marriage. In this case, we're dealing with a situation where it's a 27-year marriage. Less than half of that time has been paid for the maintenance. What is rehabilitative maintenance as we understand it anyway? Well, Your Honor, I think that the definition of rehabilitative maintenance is that the maintenance is intended to allow the person to try to get themselves back to work if they can. But in every case that I've come across where the definition of rehabilitative maintenance is considered, it's looked at the variety of factors that we've mentioned and that Section 510 refers to. In turn, including the efforts of the party to find reemployment, the viability of that person finding reemployment, as well as the circumstances of the parties financially. All of these factors need to be considered. The trial court in this case ignored all of them. It didn't even mention them and instead jumped to the conclusion that this was asking for permanent maintenance. The big difference between rehabilitative and permanent maintenance, if you review most of the authorities, are that rehabilitative maintenance means the burden of proof is on the payee to demonstrate that there is a need for continued maintenance. She bore that burden and that's where a lot of the attorneys fees in her case came from because she had to bear that burden. The judge arbitrarily slashed that in half without any reason other than to say that proof of his income and resources was irrelevant. Even though the statute calls for it. So he slashed the attorney's fees in half. But the other factors that need to be considered in considering rehabilitative maintenance are the factors that I've referred to before. And this court, in prior decisions, has actually extended the period of rehabilitative maintenance longer than the marriage, subject to further review because circumstances could change. Which is what we asked for in this case. We asked for this to be extended for an additional four-year period, subject to review at that point because they'd both be getting close to an age where she would be eligible for potentially some additional social security benefits. Wasn't she employed at the time of the dissolution? Yes, she was employed in a physician's office and it created the same kinds of problems, Your Honor, that her subsequent efforts to obtain employment. Every time she went back to work, she had the same problems. Was she full-time employed or part-time? Part-time. So the rehabilitative maintenance would have been to allow her to obtain full-time employment, which became impossible. If it would have become possible, that's correct. And I think, as I say, Your Honor, in response to your question a moment ago, if I may, that these cases have characteristically held that the period of the rehabilitative maintenance considers these various factors. And a critical part of that is the length of the marriage and the viability of a person going back to the workplace. She tried four different times, each time she wound up in the hospital. Well, it's really viability. The cases are thrown in the length of marriage to just try to put some meaning to rehabilitation and to not convert that language into permanent maintenance. Correct, correct. So, I mean, I don't think that that language is perhaps used a lot, but the purpose for that language was in those fact patterns where there was a marriage of short duration. Well, and I think, too, one of the factors that comes up in these rehabilitative maintenance cases is rehabilitative is a genre of maintenance in much the same way as permanent maintenance is. Those are the two terms that are frequently used in these cases. There's a third term, periodic maintenance, which is more like a property settlement award, and that doesn't concern us here. This is traditional maintenance or alimony. And those two genres, the maintenance that is of a permanent character, can itself be reviewable and can be terminated. And there are an abundance of cases that do that. But that doesn't mean it's open-ended. The rehabilitative maintenance, on the other hand, where the burden exists on the payee, which we've borne, is to be able to be extended in the event the person is in need of it. She clearly is. Thank you. Thank you. Mr. Anditsch? Thank you, Your Honor. May it please the court, counsel, for the record, Your Honors, my name is David Anditsch. I represent the petitioner at Applee, Terry Bolte. We see the case quite differently, obviously, from the way the appellant does. And I want to begin this presentation by emphasizing something that Mr. Schwiebert didn't mention at all, and that is the burden of proof in this court. Mr. Schwiebert was very correct in saying the burden of proof in the trial court was on his client, the payee, the party who wants to continue receiving maintenance, to establish the propriety of the judge saying, yes, maintenance will continue. It's her burden there. It, again, is her burden as the appellant before this court. And as this court well knows, the abuse of discretion standard is the one that this court is directed to apply to Judge Conway's decision to see if he made any mistake. You have applied that burden in cases probably more than I have said the phrase abuse of discretion. But I would just point out to the court that a common, frequent definition by this court of what abuse of discretion means is only if nobody could agree with the trial court's decision. Only if no reasonable person could. Thank you. I knew that you knew it better than I did, Justice Schwiebert, so you just proved my point. If no reasonable person could agree with the judge's decision, only under that circumstance can it be reversible. It is a large burden of proof before this court. That's just the initial point I wanted to make. With respect to our view of the case, we see it as a relatively straightforward case of contract interpretation fundamentally. And there are three sections of the Marriage and Dissolution Act that apply. 5502, 5504, and 510. And the reason I wanted to start with 5502, besides the fact that it's the first number numerically, is because it is a provision that says marital settlement agreements are favored by the courts. The judges encourage the public policy of the state of Illinois is to try to get parties to agree between themselves. Why do they do that? Why is that the public policy? Because the parties know better than the lawyers and probably know better than the judges, with all due respect to you, what will work for them. And that's why they do a marital settlement agreement. And that's what the parties did here. And they knew that Mrs. Bolte had myelostenia gravis eight years, seven years, eight years, something in that range. She was diagnosed with that condition before the divorce. So there were no surprises. She had that condition. She, her lawyer, and she wanted to deal with it in some fashion. Let me just ask you for a second. Sure. Talking about the contract agreement, the marriage settlement agreement. Yes. When I looked at this at first, it just seemed, it struck me as almost like oxymoronic. We're talking about rehabilitative maintenance, reviewable in what amounts to anticipated at the time probably, on or about 17 years. I mean, it's called reviewable maintenance, but then it said, or rehabilitative maintenance, but then it says reviewable in 17 years. Most rehabilitative maintenance cases we see are for some period of time, go back to college, do this, do that. And so on its face, it looks like, well, they're using the word rehabilitative, but it's going to run for 17 years and reviewable at that time. Doesn't sound like any rehabilitative maintenance I've seen in any other case, you know, is where I'm going. I understand that, and I don't think Mr. Schwebert nor I are hiding from that issue by saying we weren't there. He wasn't, neither was I. And it's different language. I would certainly acknowledge that conceptually, it's a rehabilitative maintenance provision that has some aspects of it's going to go on for a considerable period of time. I would say, Judge, and, you know, it's not really a part of this issue, but it's a part of your question. I think the law, there would be a debate between the four of us or the two of us with respect to whether this was reviewable. Under the current state of maintenance law, at a date prior to his retirement. I don't believe the law would support the position it was only reviewable is what I'm trying to say, Judge. And so I wanted to make that addition or comment in response to your comment. But it isn't, it's not the most conventional standard rehabilitative maintenance provision because it is going to go on or it has the potential to go on. I mean, somebody could have died and that would have ended at the next day, obviously, or cohabitated or remarried or whatever. But if not, it could go on, certainly to Terry's retirement. And in that event, what it became is exactly what Judge Conway was confronted with. The most extraordinary rehabilitative maintenance award I've ever seen in my practice, and I suspect you folks have seen in your practice. A rehabilitative maintenance award that at the time of the hearing had been going on for close to 14 years in time. That's unusual, to say the least, in its length and duration. I submit to this court that factored into Judge Conway's decision greatly. He's sitting there, I mean, it's easy for one side or the other sitting up here. It's a great courtroom and it's a great place to say that the judge in the trial court didn't do his job, if you're the apple lot. But I think what this court has to do is look at the facts that Judge Conway was presented with. A rehabilitative maintenance award that my client, Terry Boldy, had paid over $300,000 in maintenance. $2,000 in maintenance. This is 1998 when this award started, Justice. Okay, so now we agree that the contract says the marital settlement agreement contract, right? Yes. It says it's reviewable upon your client's retirement. That's correct. Now, if we go in and review it, what factors under the Marital Settlement Act, or the Marital Dissolution Act, what factors favor terminating that maintenance at that point? The factors that favor the termination are the factors, any one of the total listed factors under 5504 or 5510. 5510 says you look at 554, which is the original statute for awarding maintenance. You roll that into, you take a look at those factors and you take a look at the factors under 5510. Well, most importantly to Judge Conway, obviously, was he saw a valid contract in front of him. That's A11 or .11 under 5504. The court is instructed and it's mandatory for them to look at a contract. Judge Conway spent seven pages. The contract doesn't say it terminates on his retirement. It says it's reviewable. Absolutely. So now it's reviewable and we assume the contract means it's reviewable under the law. Absolutely. I agree 100%, Judge. Now, still waiting to hear what factors under the law favor terminating that maintenance at that point. He gets to consider, Judge, all of those factors. Let's start with, Judge, the property that was awarded. Judge Conway had the whole Marital Settlement Agreement in front of him. I hope before you rule, and I know it's in small print. I sort of regret that. I hope the three of you will look at pages 24 and 25 of my brief. I think it's footnote 6, and it's so long that it goes on for two pages. What is included there, Justice Schmidt, is all the property that was awarded to Sue Ellen Bolte in the original divorce decree. She got an enormously disproportionate share of the property in the Marital Settlement Agreement. I have the whole litany. Okay. Okay. And the profit sharing plans and the pension plans, and you name it, she gets it. All right. But if that's the case, then why not have the contract say it terminates upon his retirement instead of reviewable? Because between the property settlement and 13, 17 years of maintenance, he's paid none. He could have written the agreement so it just terminates then, but he didn't do that. They could have, Judge. Absolutely. There's no doubt. I guess my only response is they didn't. They drafted the one they drafted, and apparently both of them that agreed that when Terry Bolte retired, if at no other time, it was subject to being reviewed. That's what they decided to do, Judge. They certainly didn't decide to award permanent maintenance, or they would have used the word permanent. I mean, it was well established as a form of maintenance in 1998. No. They say it's going to be temporary, whether you like it or I like it or whatever, they used the word rehabilitative maintenance, and that became important to Judge Conway. In fact, good, Judge, you're the one who's been asked to be what factors he considered. Under both 5504 and 5510, it says that the, and the case law, the concept of rehabilitative maintenance requires the person who is receiving maintenance to go out and try to do something to help liberate themselves and become independently self-sufficient. So again, as Mr. Schwieber is criticizing Judge Conway, let's look at what the facts that he had in front of him, besides the fact that he had already paid $300,000, because that's one of the factors also under 5510, how much maintenance has previously been paid. He also looks at this track record of what Sue Bolte has done since the divorce in 1998. What does he see? Mr. Schwieber admitted it here. It's not a contested fact. Four times during 12 years, she went to work. I hope you read the briefs and the record very carefully. With respect to Dr. Thacker, I'm not positive I'm pronouncing his name right, okay, Thacker, Tucker, whatever, she works close to nine years for him after the divorce, and Sue Ellen Bolte testifies in the trial, she says the only reason I didn't go on, or I shouldn't put it that way, that's not fair and it's not correct, that in each of those instances, four times, four jobs, the reason she doesn't continue, or when she doesn't continue, the employer wanted her to work and sign on to full-time work. So Judge Conway is presented with a person who absolutely has skills, she has education, she's a trained nurse, she's a licensed nurse, she has a diploma, and she has worked for nine of the 12 years. Okay, now rehabilitative maintenance, and again, I guess we're getting into... When did she take social security disability? When was she determined to be disabled, unable to work under the federal law? Before, and I'm sure Mr. Fleaver will correct me if I'm wrong, I believe she took it before she was working for Dr. Thacker or Tucker, which would be early on, after the divorce. Is there such a thing as, help me out here, partial disability under social security? No. How can you be working when you're disabled under social security? Well, I believe that there's a period, and again, Mr. Schweber will surely add this, I believe she lost her social security while she was working for Dr. Thacker. Okay. Thank you. But at the time this maintenance was being reviewed, she was disabled. Oh, yes. You use the word disabled, Judge, I use the word... She had myasthenia strabis at the time. You asked at the time of the divorce? I'm sorry. No, at the time it's being reviewed when the judge has to say this is going to continue or this is not going to continue. She's receiving social security disability, correct? Yes. What does that mean? Or maybe it doesn't mean anything. With all due respect, I don't know that it means anything. It's a fact, is what it is, Judge. The question is, what does the law require with respect to rehabilitative maintenance? It requires the payee, the person who's receiving, to try to be employable, either at the same job or a different job. And if you're honored to look at page 7 of the opinion, you'll see Judge Conway underlined, with respect to his feelings about Sewell and Volpe's efforts at work, that the only thing she tried to do in four instances that she testified to was to go back to being an office nurse, which she was doing during the marriage, for these other doctors. And he underlines that and adds emphasis that she only tried in her own vocation. She didn't try to do anything else. She didn't try to work part-time doing something at a computer. She didn't try to set up a home office for whatever. There's none of that evidence that she tried to do anything. And what does she say on the witness stand about that? She says very candidly, I felt better not working. That's as close to a quote of her testimony as I can give you. That doesn't square with rehabilitative maintenance and continuing rehabilitative maintenance. I would suggest probably everybody in this room would come up here and sign a document that says, I feel better when I get a day off and I don't go to work, too. Well, everybody feels that way. But that doesn't give you, under the law, the right to go forward and get rehabilitative maintenance. And I think that Judge Conway, with all due respect to Mr. Swivert's arguments, I think he took a very hard and a very serious look at this. He wrote a 15-page opinion, which, in my experience as a trial judge, is substantial. If I could just have one second to say about the attorney's fees. It's judged under the same standard of abuse of discretion. Judge Conway, if you read his opinion, had many difficulties with the attorneys that were incurred in this case. Mr. Swivert was awarded almost $7,000 in attorney's fees, justices. And that, interesting and ironically, is $5,000 more than the trial lawyer was paid for the divorce in the trial court. All right. Thank you very much, Justices. Mr. Swivert. Thank you, Your Honors. Let me begin by just responding to a rather curious argument that my opponent has just advanced, and that is that Sue was not really disabled and didn't exercise diligence. I'd like to quote a couple of things that Mr. Anditch put in the record, and the Court can find this record at page 7, page 8, and 15, in which he stated, quote, we have acknowledged and admitted in every way we can, Judge, that Ms. Boldy is disabled. Further on, she has that medical condition. She is disabled and unable to work. Further on, under oath, Sue's total disability and her inability to work. Okay, but at that point, his argument is, are we talking about rehabilitation? If he continues to pay her, is that really rehabilitative maintenance, or is it? Well, Your Honor, yes, because there is the possibility. And, Your Honor, in response to your question, she was actually determined, under a request from Mr. Boldy sent to Social Security, which is one of the documents, that she get disability before the parties were divorced. So he was well aware of the significance of her problems, and that's why they put that reviewable language in there, so it could be extended. I think the answer to the question is, how long can reviewable maintenance continue, is based on the circumstances of the case. The reason to review about it. If we read in everything into rehabilitative, in other words, you're working toward becoming self-sufficient, if the person is totally disabled, no longer working toward gainful employment, are we still talking about rehabilitative maintenance? Well, the rehabilitation could occur in a variety of different ways. A cure may be found for the illness. In fact, that was probably one of the reasons they put that reviewable clause in there. There may be a cure that's found. It's possible that there could be a change in his circumstances or her other circumstances. Or there may be some other source of income, certainly not the public aid system right now, that might help her out so she no longer needed the support from Mr. Boldy. But none of those things exist at this point in time. And as a result, in keeping with what the courts have held before, you determine the rehabilitative maintenance based on the ability of the person to resume work. Here she clearly couldn't. And the judge understood that. The judge said he believed to a reasonable degree of medical certainty that Dr. Brunson had testified she was disabled. So it wasn't her lack of looking for work, as Mr. Anderson suggested. He just didn't like the idea of maintenance being reviewed and continued. And I agree with Mr. Anditch. It's true that the standard in this case is a question of did the judge rule against the manifest weight of the evidence. With due respect, Your Honors, this judge ignored the evidence. He ignored every one of the requirements that the court is supposed to look at under Section 510A-5. What efforts have been made to find employment? What are the resources of the parties? How has their income changed? Mr. Anditch made much of the property she was awarded in the judgment, I explained in my opening, that that's gone because of her medical expenses, because she tried going back to work and was hospitalized and wound up spending it for medical. This is a terrible, terrible conundrum for Sue Bolte. She doesn't want to be dependent on her ex-husband, but her illness contracted during the marriage, which both of the parties knew about when this agreement was provided for that. Judge, I think you were right on the money when you said beforehand, what factors favored the judge's ruling? None, in this case. On attorney's fees, just very briefly on that. The judge's denial of half of our attorney's fees was based on the fact that he felt that evidence regarding Mr. Bolte's income and expenses was irrelevant. Under Section 510A-5, that is absolutely incorrect. The statute makes very clear that those are factors the court has to consider. We have the burden of proof of going forward with that. We had to respond to Mr. Bolte's repeated pleadings over a period of two years, continued motions. You can examine and see how lengthy those pleadings were. They were more legal briefs than pleadings in many instances, and those all needed to be responded to. The trial court did find Mr. Bolte had the ability to pay fees. Sue clearly has no ability to pay those fees, and she is entitled under Section 508 of the statute to be equally before the court. Our legal system recognizes the justice to both parties and not based on the superior income of one versus the other. Section 508 is intended to level that playing field. If Sue had done what Mr. Anditch is suggesting and what the court allowed, she would have been underrepresented in this proceeding and would have been unable to proceed. We're asking that those attorney's fees be awarded both for the trial, at the full level submitted to the court, and undisputed as having been incurred and for this appeal. We would further ask that the court either reverse the trial court and reinstate the amount of maintenance at the $2,000 level retroactive to October 28th, or more appropriately, because of the deficit in her income versus expenses, that it be increased modestly to $2,200. Mr. Anditch has suggested in his closing argument before the trial court that this should be permanent and nonreviewable. And if Mr. Anditch is prepared to have the court's decision be permanent and nonreviewable, we'll go along with that as well. What we have submitted to the trial court was that it be reviewable after four years. Thank you, Your Honors, for your attention. Thank you, Mr. Kluber. Mr. Anditch, thank you. This matter will be taken under advisement. The written disposition will be issued.